J-A13003-20

2020 PA Super 202

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 24 EDA 2020 |

Appeal from the Order Entered December 5, 2019
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): CP-51-DP-0001179-2018

BEFORE: BENDER, P.J.E., LAZARUS, J., and STRASSBURGER, J.[*]

OPINION BY BENDER, P.J.E.: **FILED AUGUST 19, 2020**

T.D. ("Mother") appeals from the December 5, 2019 order finding her to be a perpetrator of child abuse against K.D. ("Child"), born in October of 2017, pursuant to Section 6303(b.1)(5) of the Child Protective Services Law, 23 Pa.C.S. §§ 6301-6387 ("CPSL").[1] We affirm.

We glean the following facts from the record: On January 29, 2019, the Philadelphia Department of Human Services ("DHS") received a Child Protective Services ("CPS") report, which alleged that Mother had become agitated after she and her live-in girlfriend ("Paramour") argued over Paramour's refusal to return to their home on January 25, 2019. According to the report, Mother told Paramour that she would stab Child with a knife if she did not return home. Paramour informed Mother's sister, C.S., of Mother's

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child's father is not named in the record and is not a party to this action.

statement, and C.S. removed Child and his nine-year-old sibling, M.G., from Mother's home.

> DHS interviewed M.G. during its investigation of the report:
>
> M.G. stated … that Mother was extremely emotional during the incident and had threatened to drown and stab [Child]. M.G. stated that Mother had rubbed a knife over [Child's] body and had threatened to cut his fingers multiple times. M.G. stated that he managed to convince Mother not to drown [Child] in the bath water, and that she then threatened to place a plugged-in iron in the bath tub, which was filled with water and in which both M.G. and [Child] were sitting.
>
> M.G. further reported that Mother gets upset when [P]aramour does not come home or if she goes away for a long time. M.G. stated that he is fearful of Mother and believes that she will harm [Child].

DHS's Brief at 3-4. DHS found the allegations in the report to be true and, accordingly, determined the report to be "indicated."

On the same date that DHS received the CPS report, it obtained an Order of Protective Custody ("OPC") for the children and placed them with their maternal aunt, C.S. Mother demanded that the children be returned to her. A shelter care hearing was held on January 31, 2019, at which the OPC was lifted and the temporary commitment to DHS was ordered to stand. On February 7, 2019, a dependency hearing was held and Child was adjudicated

dependent.[2, 3] Permanency review hearings were subsequently held on March 7, 2019, June 18, 2019, August 22, 2019, October 17, 2019, and December 5, 2019.

At the December 5, 2019 hearing, the trial court heard DHS's request for a finding of child abuse against Mother. Ms. Massey testified on behalf of DHS, and DHS moved into evidence the testimony that M.G. gave in chambers at the February 7, 2019 hearing, as well as the testimony given by Ms. Massey and C.S. on that same date. After hearing argument from all counsel, the trial court made a finding that Mother was the perpetrator of child abuse against Child, pursuant to 23 Pa.C.S. § 6303(b.1)(5).

Mother filed a timely appeal on December 26, 2019, along with a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(a)(2). Mother now presents the following sole issue for our review: Did the trial court err in ruling that DHS met its burden of proof to support a finding of child abuse under Section 6303 of the CPSL? *See* Mother's Brief at 2.

Preliminarily, we note:

---

[2] Adjudication was deferred for M.G., because his father was present at the hearing and presented himself as a ready, willing, and able parent. M.G.'s petition was eventually discharged when his father was deemed to be appropriate.

[3] At the February 7, 2019 hearing, DHS presented the testimony of the assigned DHS social worker, Regina Massey, C.S., and M.G. Mother presented no witnesses.

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*Interest of S.L.*, 202 A.3d 723, 727 (Pa. Super. 2019) (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)).

Mother claims the trial court erred in its determination that she perpetrated child abuse pursuant to Section 6303(b.1)(5) of the CPSL. In accordance with Section 6303(b.1)(5), "[t]he term 'child abuse' shall mean intentionally, knowingly or recklessly … [c]reating a reasonable likelihood of bodily injury to a child through any recent act or failure to act." 23 Pa.C.S. § 6303(b.1)(5). "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S. § 6303(a) ("*Bodily Injury").* Additionally, for the purposes of the CPSL, the terms "intentionally," "knowingly," and "recklessly" have the same meaning as set forth in 18 Pa.C.S. § 302. *See* 23 Pa.C.S. § 6303(a). Section 302 of the Crimes Code defines these kinds of culpability as follows:

(1) A person acts intentionally with respect to a material element of an offense when:

   (i) If the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

   (ii) If the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

    (i) If the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

    (ii) If the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b).

The requisite standard of proof for a finding of child abuse pursuant to Section 6303(b.1) is clear and convincing evidence. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. Super. 2015). Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *G.V. v. Department of Public Welfare*, 91 A.3d 667, 672 (Pa. 2014). In certain situations, however, the identity of the abuser need only be established through *prima facie* evidence:

Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

*In re L.Z.*, 111 A.3d at 1170 (quoting 23 Pa.C.S. § 6381(d)).

Here, Mother argues that DHS failed to meet its burden of proof in establishing child abuse, in accordance with Section 6303(b.1)(5). **See** Mother's Brief at 3. Mother does not deny running a knife along Child's body or threatening to drop a plugged-in iron in the bathtub. Rather, she argues that her actions were for the purpose of getting the attention of her Paramour and that she did not intend to cause any injury to Child. **Id.** In regards to the incident with the knife, Mother avers that "[a]t no time did Mother place the sharp part of the knife near … [C]hild or stab the sharp part of the knife near … [C]hild[;]" thus, there was no reasonable likelihood of Child getting injured. **Id.** at 4. Mother claims that the trial court abused its discretion in inferring that there was a likelihood of injury to Child. **Id.** As to the bathtub incident, Mother claims that it was never established whether "the iron could actually reach the bathtub or how close the iron came to the bathtub[,]" and that without these facts, there is no clear and convincing evidence of a reasonable likelihood of injury. **Id.** at 5. Mother concludes that the trial court abused its discretion by inferring that the iron could reach the bathtub and, therefore, making a finding of child abuse. **Id.** We deem Mother's claims to be wholly without merit.

In finding that Mother is a perpetrator of child abuse, the trial court relied heavily on the testimony of M.G. and C.S., "each having presented very vivid and collaborating [*sic*] details regarding the incidents…." Trial Court Opinion ("TCO"), 2/10/20, at 2 (unnumbered). M.G. testified *in camera* at the

February 7, 2019 hearing, with all counsel present. Following is a summary of his testimony produced by DHS:

> M.G. stated that the family household consisted of Mother, [Paramour], … M.G.[,] and [Child]. M.G. testified that on the day of the incident, [Paramour] had picked him up from school and dropped him off at home. When he entered the family home, Mother asked him where [Paramour] had gone after dropping him off. M.G. responded that she had just dropped him off and had left without saying where she was going. Within a few minutes of being told this, Mother began to cry and to pound the floor. After a few minutes, Mother came out of her bedroom and told M.G. that [Paramour] had called her and told her to kill herself and the children. At this point, the only people in the home were Mother and the children. M.G. stated that Mother told him that she would not hurt him. According to M.G., Mother then grabbed a knife and went to [Child], who was in M.G.'s bedroom. M.G. stated that he saw Mother "rubbing the back rim of … [the knife] all over his body. And every time he put his hand right here she [would] like tap the knife right next to his hands." M.G. described the knife as being a normal knife that was rigid and smooth.
>
> M.G. stated that Mother next grabbed [Child] and ran into the bathroom with him. M.G. stated that he approached the bathroom and saw Mother holding [Child,] and that she was about to place him in the water, as if she was going to drown him. M.G. convinced Mother to put [Child] down. At some point, both M.G. and [Child] ended up in the bathtub together. While they were in the tub, Mother went into the kitchen and returned with a clothes iron that had been plugged into a wall outlet. M.G. testified that he was scared while this was happening.
>
> [C.S.] came to the home immediately after the incident in the bathroom had ended. According to M.G., everything between Mother and [C.S.] was "normal" until Mother learned that [C.S.] had been texting with [Paramour], at which point Mother attacked [C.S.], who attempted to fend off the attack and to take the knife away from Mother. M.G. testified that [C.S.] called to him to dial 911. M.G. ran to the kitchen and called 911. When he returned to [the] living room, he found that [C.S.] had managed to pin Mother down on the couch. M.G. testified that he felt sad and scared, and began to pull his hair out due to the stress caused by Mother's behavior.

DHS's Brief at 6-7 (unnecessary capitalization and citations to record omitted).

[C.S.] testified that she is five years older than Mother, that they had grown up together, and that they now lived 12 minutes away from each other. N.T., 2/7/19, at 25-26. C.S. indicated that she has been involved with both children during their entire lives. *Id.* at 26.

> Regarding the incident at issue, [C.S.] stated that on [January 25, 2019,] she received a telephone [call] from [Paramour], who told her that Mother was going to hurt the children and that [Paramour] did not know what to do. While she was on the phone with [Paramour], [C.S.] received calls from Mother and M.G., which allowed [C.S.] to hear what was occurring in the house. [C.S.] stated that Mother said …, "Hey daddy, you were supposed to protect them, daddy. You failed. You didn't protect them. You lied. I put them in the tub. That's your fault, hahahahaha." And then Mother hung up, ending the call.
>
> Concerned for the children's safety, [C.S.] and [Paramour] went to Mother's house, which [C.S.] likened to a "nightmare." The lights in the home were turned off. At some point after [C.S.] arrived at the home, Mother came to the window and [C.S.] was able to see that the children were okay. [C.S.] entered the home and attempted to leave with the children, which led to [a] physical altercation between Mother and [C.S.] During the altercation, Mother brandished a knife, which [C.S.] was able to remove from Mother's hand. Upon losing possession of the knife, Mother grabbed a wood[en] panel and attempted to batter [C.S.] with it. At one point during the altercation, Mother hit her head against the wall three times and then attempted to jump out of the bathroom window[,] after having … attempted unsuccessfully to jump out a window in the children's bedroom. [C.S.] recalled that she had yelled to M.G. to call 911. M.G. placed the call and police were dispatched to the scene.

DHS's Brief at 9-10 (unnecessary capitalization and citations to record omitted). C.S. further testified that after she managed to restrain Mother and keep her from throwing herself out of the bathroom window, Mother grabbed

a gallon of bleach and tried to drink from it. C.S. grabbed the bleach from Mother and poured it down the sink. *Id.* at 10-11. The trial court found the testimony of M.G. and C.S. to be both credible and consistent. *Id.* at 40-41.

In addition to the testimony of M.G. and C.S., Ms. Massey testified on behalf of DHS, regarding her investigation of the CPS report involving Mother. Ms. Massey stated that she determined the report of abuse to be "indicated" against Mother, as Mother "created a reasonable likelihood of bodily injury to a child through [a] recent act or failure to act." N.T., 12/5/19, at 7-8. Ms. Massey further read from her investigation assessment:

> Upon investigation[,] this social worker finds this allegation to be indicated. Although [M]other denied the allegations, [M.G.] appeared to be credible while telling the story of how [M]other tried to harm him and [Child] because her [Paramour] refused to come home. M.G. stated that Mother had a knife running around [Child's] neck, poking … the knife between his fingers while he was holding the crib, and threatening to throw an iron in the bathtub while he and [Child] [were] in the tub. The social worker last saw [the] children on [February 15, 2019,] at [C.S.'s] house, and at that time, they appeared to be safe, with their basic needs met.

*Id.* at 8-9. Ms. Massey also indicated that she had asked Mother about her mental health status and that Mother had responded that she had post-traumatic stress disorder ("PTSD") and that she had not been taking her medication. N.T., 2/7/19, at 16.[4] When she inquired about the allegations in the CPS report, Mother denied all of the allegations and asserted that C.S. coaxed M.G. "to say these things." *Id.* at 17. Finally, Ms. Massey indicated

---

[4] C.S. testified that Mother is bi-polar, has depression, and has had several past suicide attempts. *Id.* at 34.

on cross-examination that she believed returning the children to Mother's care would be a risk to the children's lives or health. *Id.* at 21.

DHS argues that Mother's "erratic behavior and highly agitated state coupled with the unpredictable movements of an 18-month old child created a reasonable likelihood of bodily injury to Child." *See* DHS's Brief at 18 (citing 12 Pa.C.S. § 6303(b.1)(5)). Mother acted recklessly with the knife, *i.e.*, she "consciously disregarded a substantial and unjustifiable risk" that Child could have been cut or stabbed. *Id.*; *see also* 18 Pa.C.S. § 302(b)(3). Likewise, Mother's holding of a plugged-in iron over the children's bathtub filled with water created an unjustifiable risk of injury or death, as the iron could have slipped from her grasp and fallen into the bathwater. *Id.*

Applying the facts to the CPSL, the trial court found Mother to be a perpetrator of child abuse, pursuant to Section 6303(b.1)(5). *See* TCO at 2 (unnumbered) (citing N.T., 12/5/19, at 14-17). Specifically, the trial court determined that "holding an appliance that is plugged into a wall over a bathtub of water would definitely create a reasonable likelihood of bodily injury and, quite frankly, potentially death for two young children in a bathtub had mom accidentally, unintentionally, or whatever, dropped that plugged-in instrument into the water." *Id.* at 16. The trial court added that Mother's actions of taking a knife and stabbing it in between the fingers of Child, who was barely more than one-year-old at the time, could have severely injured Child. *Id.* at 17 (*e.g.*, "any miss could have severely injured … [C]hild, could have struck a vein that [would] cause bleeding out, and [Mother] put the knife

to [Child's] neck"). Accordingly, the trial court found Child to be the victim of child abuse and changed the report from "indicated" to "founded." ***Id.*** We deem the trial court's findings to be supported by the record, and we discern no abuse of discretion.

Based on the foregoing, we affirm the December 5, 2019 order finding Mother to be a perpetrator of child abuse, pursuant to 23 Pa.C.S. § 6303(b.1)(5).

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 8/19/2020*

- 11 -