J-A06041-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.H, A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: H.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 960 WDA 2022 |

Appeal from the Order Entered August 4, 2022
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-DP-45-2022

BEFORE:  OLSON, J., NICHOLS, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:                **FILED: FEBRUARY 15, 2023**

H.J. (Mother) appeals from the August 4, 2022 order of the Court of Common Pleas of Westmoreland County (trial court) designating her as a perpetrator of child abuse against J.H. (Child) pursuant to the Child Protective Services Law (CPSL).[1]  We affirm.[2]

**I.**

We glean the following facts from the certified record.  The Westmoreland County Children's Bureau (WCCB) took emergency protective

_____

* Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 6301 *et seq*.

[2] J.H. (Father) has also appealed the child abuse determination entered against him at the same proceeding.  We address his appeal at 961 WDA 2022.

custody of Child on April 1, 2022, after he had been hospitalized for severe malnourishment. It subsequently filed for dependency and sought a finding of abuse against Mother and Father.[3] Mother and Father stipulated to dependency but opposed the finding of abuse.

At the dependency hearing, WCCB sought to introduce court records from Clackamas County, Oregon, establishing that Mother had entered a guilty plea to child neglect in 2012. It also produced records from Oregon's Department of Human Services (DHS) establishing that findings of abuse had previously been entered against Mother in four cases. Mother objected to the admission of these records on Rule of Evidence 404(b) and relevancy grounds. The trial court admitted the criminal records and admitted the DHS records for the limited purpose of establishing that prior findings of abuse had been entered, but did not admit the narrative portions of the records. Upon Mother's request, the trial court also took judicial notice of the emergency declarations issued by the governor in response to the covid-19 pandemic.

WCCB called Dr. Adelaide Eichman (Dr. Eichman) from the Division of Child Advocacy at Children's Hospital of Pittsburgh to testify regarding their treatment of Child. Child was admitted to the hospital on March 24, 2022, and was diagnosed with severe failure to thrive. He was 12 months old,

---

[3] WCCB filed dependency petitions for four of Mother and Father's children. Only the finding of abuse as to Child is at issue in this appeal.

- 2 -

weighed 15.1 pounds and had developmental delays. A large flat spot on the back of his head caused abnormal development in his face. His hair was thinning and matted on the back of his head and he had developed lanugo, a very fine hair, on his back. He was unable to sit up on his own and his weight was below the third percentile for children his age. A skeletal survey revealed he had osteopenia or thinning of his bones, and brain imaging showed he had lost brain volume. These conditions result from chronic malnutrition or starvation.

Dr. Eichman testified that the cause of Child's medical problems was chronic underfeeding for a period of months, and she could not say whether the loss of brain volume would be reversible. She opined that Child had suffered from neglect and said that once he was fed regularly he began gaining weight. When he was discharged from the hospital after four days, he weighed 16.7 pounds and by mid-April he weighed 19 pounds.

Upon speaking to Mother, Dr. Eichman learned that she fed Child powdered milk instead of powdered formula, which is not recommended for children under one year old. Mother said she fed Child two to four ounces of milk every two to four hours, except overnight, which was not consistent with Child's severe malnourishment. Mother told Dr. Eichman that she had not been able to obtain medical insurance for Child after moving to Pennsylvania. Dr. Eichman testified that she did not believe insurance was necessary to schedule an early intervention evaluation for a child and insurance would not

have been required for Child to be seen in the emergency room. The hospital additionally has employees who could have helped Mother and Father enroll Child in medical insurance if necessary.

Jarrett Dorazio (Dorazio), a physician assistant who evaluated Child prior to his hospitalization, testified that his office does not require insurance to see a patient, and that they direct patients without insurance to state resources where they can obtain it. Dorazio first saw Child on March 10, 2022, for a well visit that Mother and Father were required to schedule due to WCCB involvement with one of their other children. Dorazio was concerned about Child's muscle tone, neurologic and gross and fine motor development. Child could not sit up or push up from his stomach on his own, while most children at his age could walk. He was not using words and would stare at the wall without reacting to noises or Dorazio's voice. His arms and hands remained in a clenched position and would return to that stance if Dorazio attempted to move them. At the first visit, Child weighed 14.6 pounds. Dorazio diagnosed Child with failure to thrive, low muscle tone and neglect, and recommended that Mother have him evaluated by the Children's Institute and then return for a follow-up visit. He recommended applying for Women, Infants and Children (WIC) benefits, and Mother said that she was unable to get WIC and that formula was expensive. Dorazio testified that he did not make a ChildLine report after Child's first visit because he believed Child had not been seen by a doctor in approximately ten months and he wanted to give Mother and

Father a chance to make a good faith effort at complying with his recommendations.

Dorazio saw Child for a follow-up visit on March 24, 2022, and he had gained approximately half-a-pound. Due to the low weight gain, Dorazio recommended that Mother admit Child into the hospital. Child gained weight more rapidly after his hospitalization and at a well-visit on April 15, 2022, he weighed 19.10 pounds. At his most recent visit in May 2022, Child was able to sit up with some assistance, was making babbling noises and was interacting with his surroundings and reaching for his toes and ears.

Rachel Menhorn (Menhorn), a school nurse who worked with one of Mother and Father's other children, testified that she provided them with written information regarding the Children's Health Insurance Program (CHIP) and the online application process on two occasions. She also spoke with Mother directly about CHIP multiple times. Mother did not ask for any help with the application but told Menhorn in January 2022 that the state was giving her the "runaround." N.T., 5/25/22, at 119.

Colleen Flynn (Flynn) of the Children's Institute testified that she opened a case with the family in the Star Babies program, which provides an intensive in-home family services specialist. She began working directly with the family in mid-March and first saw Child shortly before his hospitalization. She said he was emaciated and that his appearance was shocking. Mother told Flynn that Child had recently been to the doctor but did not consider Dorazio's

recommendations urgent. She said she did not have time to make phone calls for Child's care. She had scheduled an appointment with a gastroenterologist but had not followed up with a nutritionist or feeding specialist. Flynn said that Child had a blank stare, lanugo on his back, and his hands and fingers were curled and stiff. He did not smile or make eye contact and would cry when he was touched.

After Child was discharged from the hospital, Flynn began visiting the family to weigh Child every day, with the understanding that if he lost weight, WCCB would intervene. The weigh-ins took place as planned for several days but Mother missed the appointment on April 1, 2022. She texted Flynn throughout the day to push the visit back and said that she was running an errand in Pittsburgh. Flynn was not able to complete the visit and WCCB took custody of the children that day. Flynn opined that Mother did not understand the urgency of Child's condition. Flynn spoke with Father once on the phone prior to Child's hospitalization, and he wanted to know why the doctor wanted to send Child to the hospital.

Amanda Karas (Karas), a caseworker for WCCB, opened a case with the family in January 2022 following a referral related to one of Father's other children. At that time, Mother and Father were living with their four children and another adult couple with two children. Mother requested parenting services and services for children with special needs because she was concerned about the development of Child and his sister. Karas did not

perform a home visit with the family until after Child was released from the hospital at the end of March, but prior to that she was in contact with the Star Babies staff about the family.

Karas learned that the last time Child had seen a doctor was in July 2021 when the family still lived in Oregon. Mother and Father reported that they had taken Child to a local emergency room for a cough in July 2021, but the hospital's records did not confirm any visit had taken place. Mother and Father also told Karas that they had not taken Child to the doctor because they did not have health insurance. When WCCB became involved with the family, Mother was the primary caregiver. They had previously left the children with one of the other adults in the household while Mother and Father worked, but Mother quit her job in October because they were concerned that the other adult was not providing appropriate care.[4] Father continued to work full-time.

After Child's release from the hospital, Mother and Father attended an evaluation to qualify for WIC. They told Karas that they had previously received WIC benefits, but WIC staff reported that they had no involvement with the family outside of the first evaluation. Mother and Father told Karas that WIC had required regular weight checks that were too strenuous so they

---

[4] This adult continued to live with the family and help with caretaking into 2022. She was eventually reported for abuse of one of the other children via ChildLine and faced criminal charges. She then moved out of the home.

discontinued the program. WIC staff confirmed that recipients usually have a monthly evaluation that includes a weigh-in.

Mother and Father were able to successfully obtain health insurance shortly before Karas began working with the family at the end of March. Mother reported to Karas that she had difficulty applying for insurance through the state and providing all the necessary documentation. Mother submitted exhibits at the hearing showing that she applied for health insurance through the Pennsylvania DHS in July and August 2021, but the applications were rejected because she did not provide required records. Mother told Karas that she attempted to send the documents and speak to DHS on the phone but was not able to obtain insurance.

Joe Bowles (Bowles), one of the individuals who lived with Mother and Father, testified on their behalf. He said Mother quit her job in October 2021 to stay home, though she earned money baking cookies at home and delivering them to customers. He said that Child had difficulty with formula and was spitting it up a lot, but Mother switched formulas and that helped the issue. He said Mother and Father applied for health insurance and called DHS multiple times about why their applications were rejected. He further testified that Mother called providers about obtaining health insurance for the children but it was very expensive. He said Mother did take Child to the hospital at one point for his cough.

Following the hearing, the trial court adjudicated Child dependent and entered an order determining Mother perpetrated abuse pursuant to the CPSL. Mother timely appealed and she and the trial court have complied with Pa. R.A.P. 1925.

## II.

Mother raises three issues on appeal: whether the trial court abused its discretion in finding that WCCB presented clear and convincing evidence that she had abused Child; whether the trial court abused its discretion in admitting evidence of her criminal conviction and the findings of abuse entered against her in Oregon; and whether the trial court abused its discretion by failing to consider the shutdowns related to the covid-19 pandemic as an exception to the finding of abuse under the CPSL.[5]

## A.

Mother first argues that the evidence at the dependency hearing did not establish that she acted intentionally, knowingly or recklessly to perpetrate abuse against Child. She argues that she attempted to get medical care for

---

[5]

> The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

***Interest of K.D.***, 237 A.3d 566, 568 (Pa. Super. 2020) (citation omitted).

Child by first seeking health insurance and contends that none of the witnesses testified that she engaged in abuse, but rather that the source of Child's medical issues was neglect. She points out that Dorazio did not think it was necessary to file a ChildLine report the first time he treated Child, and that the hospital released him back into her care after his treatment.

A determination that a person perpetrated abuse against a child must be supported by clear and convincing evidence. *Interest of T.G.*, 208 A.3d 487, 490 (Pa. Super. 2019). The definition of child abuse under the CPSL includes intentionally, knowingly or recklessly causing "serious physical neglect of a child." 23 Pa.C.S. § 6303(b.1)(7).[6] It defines serious physical neglect as follows:

> Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:
>
> ***
>
> (2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

23 Pa.C.S. § 6303(a). The statute further defines "recklessly" with reference to the Crimes Code's definition of the term:

---

[6] The trial court's order does not specifically identify the subsection of the definition of child abuse that it found WCCB had established by clear and convincing evidence. However, it did state that "neglect" by Mother and Father "caused severe malnutrition" of Child. Order, 8/4/22 at 3.

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

*Id.* (citing 18 Pa.C.S. § 302). Severe neglect resulting in failure to thrive can be the basis for a finding of abuse under subsection 6303(b.1)(7). ***Interest of T.G.***, ***supra***, at 494-95 (finding clear and convincing evidence of severe physical neglect when mother missed medical appointments for child and did not comply with treatment recommendations, resulting in failure to thrive).

The record overwhelmingly supports the trial court's determination that Child suffered serious physical neglect by Mother's actions or inactions. The professionals who evaluated Child or visited with the family in their home uniformly described Child as emaciated, low-energy, with low muscle tone and as being significantly developmentally delayed compared to the average 12-month-old child. At 15.1 pounds, Child's weight was well below the third percentile for children of his age, and he was unable to support his head while being held by Mother or sit up on his own. He had a flat spot on the back of his head that resulted in disfiguration to his facial features. He had not reached average benchmarks, such as walking or crawling, and did not make eye contact or typical verbalizations for a child his age. His condition was immediately apparent to the naked eye of the individuals who evaluated him.

Moreover, further testing revealed that he had lost brain volume and experienced osteopenia and lanugo. All of these conditions are caused by malnutrition, and Dr. Eichman was unable to say whether the loss of brain volume would ultimately be reversible. After enumerating the many medical and developmental issues Child was exhibiting, Dr. Eichman testified that he had been diagnosed with failure to thrive and had been chronically underfed for a period of months. Once he received adequate nutrition, he had no trouble gaining weight. She concluded that "essentially from a medical standpoint, the baby just needed to be fed." N.T., 5/25/22, at 39. She further stated, "I do want to underscore that neglect is not a benign process. It is not any better or worse than physical abuse, for instance." *Id.* at 56.

This evidence amply supports the trial court's conclusion that Mother, as Child's caregiver, "consciously disregard[ed] a substantial and unjustifiable risk" to his health and well-being by failing to feed him adequately for an extended period of time. 18 Pa.C.S. § 302; 23 Pa.C.S. § 6303(a). The neglect was immediately apparent to medical and WCCB professionals upon seeing Child. While he was released to Mother and Father's care after his first well-visit and his hospitalization, this was only after they received counseling on the next steps for his care and agreed to work with the Star Babies project and comply with daily weigh-ins to monitor his progress. Less than a week after his release from the hospital, Mother missed one of the required weigh-ins, resulting in his removal. Finally, the medical professionals who testified

at the hearing confirmed that Child would have received care regardless of whether he had medical insurance. Her first issue merits no relief.

**B.**

Next, Mother argues that the trial court abused its discretion in admitting evidence of her criminal conviction for neglect and the founded reports of abuse against her in Oregon.[7] She argues that the records were from events too remote in time to be relevant, that their admission violated Rule of Evidence 404, and that they contained double hearsay.

Under Rule 404(b), evidence of specific crimes or acts is admissible only for limited purposes:

**(b) Other Crimes, Wrongs, or Acts.**

(1) *Prohibited Uses*. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

---

[7] We review the trial court's decision to admit this evidence for an abuse of discretion. *In re A.J.R.-H.*, 188 A.3d 1157, 1166 (Pa. 2018). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Tyson*, 119 A.3d 353, 357-58 (Pa. Super. 2015) (citation omitted).

Pa.R.E. 404. In its opinion, the trial court concluded that the fact of the prior criminal conviction and abuse findings was "relevant to show the absence of mistake and a lack of accident as to [Mother and Father's] treatment of [Child], as well as their knowledge of the implications of an allegation of abuse." Trial Court Opinion, 10/25/22, at 4. It explained that "[t]he fact that the Appellants have been through this process before was relevant to demonstrating that their lack of adherence to the recommendations of Dr. Eichman, [] Dorazio, and [] Flynn was, indeed, abusive to [Child]." *Id.*

We discern no abuse of discretion. Mother's criminal conviction and findings of abuse in Oregon demonstrate that she had previously been involved in child abuse investigations and should have appreciated the seriousness of the concerns raised by WCCB and Child's medical providers. Despite detailed counseling by Dorazio regarding Child's development delays and nutritional needs, she continued to feed him so inadequately that he gained only half-a-pound in the two weeks between appointments. Once he was hospitalized and fed adequately, he gained approximately 1.5 pounds in four days. Moreover, her caseworkers from WCCB and Star Babies emphasized to her that daily weigh-ins were necessary to monitor Child's progress, and that he would be removed from her care if she was unable to meet that requirement. Mother nonetheless chose to miss weigh-ins less than a week after Child was returned to her care, resulting in his removal from her home. The evidence of the prior findings of abuse supported the conclusion

that Mother understood the importance of complying with these directives. The trial court did not abuse its discretion in holding that the fact of the prior conviction and findings of abuse, without reference to the narrative portions of the documents, supported her knowledge, lack of accident and absence of mistake failing to care for Child.

Additionally, the record belies Mother's argument that the records were inadmissible because they contained double hearsay. At the hearing and in its subsequent order, the trial court specifically held that the narrative portions of the reports would not be admitted. **Compare In re A.J.R.-H.**, 188 A.3d 1157, 1169-70 (Pa. 2018) (finding that error in admitting double hearsay narratives in agency reports was not harmless when the trial court relied on the information therein when terminating parental rights). Rather, it admitted only the fact of the criminal conviction and past founded reports to establish knowledge and a course of conduct. Because the alleged double hearsay was not admitted as evidence, no relief is due.[8]

---

[8] Additionally, the admittance of these records was harmless in the context of the entire record. An error is not harmless and the appellant is entitled to a new hearing if, "in light of the record as a whole, an erroneous evidentiary ruling could potentially have affected the decision." **A.J.R.-H.**, **supra**, at 1170 (addressing harmless error in the context of a termination of parental rights proceeding). The evidence that Mother perpetrated abuse against Child by failing to provide him with adequate nutrition for months was overwhelming, and the trial court noted in its opinion that the records from Oregon played a *de minimus* role in its decision. **See** Trial Court Opinion, 10/25/22, at 4.

- 15 -

**C.**

Finally, Mother argues that the trial court erred by failing to consider environmental factors, namely, lack of health insurance and the covid-19 shutdowns, as rendering Child's condition outside of her control. She highlights that Pennsylvania was under a disaster declaration in July 2021 that precluded her from visiting DHS offices to obtain health insurance for Child. She maintains that she attempted to communicate with the department online and by phone but was still unsuccessful.

The CPSL mandates that certain environmental factors outside of a parent's control cannot support a finding of abuse:

> No child shall be deemed to be physically or mentally abused based on injuries that result solely from environmental factors, such as inadequate housing, furnishings, income, clothing and medical care, that are beyond the control of the parent. . . .

23 Pa.C.S. § 6304(a).

The record is devoid of any evidence that the covid-19 pandemic prevented Mother from obtaining medical care for Child or from feeding him appropriately. While Mother requested that the trial court take judicial notice of the governor's covid-19 disaster declarations, she presented no evidence that the shutdowns affected her ability to obtain health insurance or medical care for Child. To the contrary, the documentation she submitted into evidence revealed that she began the online process of applying for health insurance and other benefits through the state in July 2021. She promptly received notice that her application had been received and that she needed to

- 16 -

submit additional documentation either in person, online or by mail or fax. She was also required to complete an in-person interview.

Mother was then notified less than a week later that she qualified for expedited Supplemental Nutrition Assistance Program (SNAP) benefits amounting to $1,393 through the end of August 2021, but still needed to provide additional documentation. She did not complete her required interview by July 30, 2021, and was notified that she would need to do so by August 13, 2021. She then received a second notification that she needed to provide employment and income verification documents to qualify for cash assistance, medical assistance and SNAP. When she did not provide the requested documents, DHS notified her that her request was denied and that she could appeal that decision.

Mother started the process anew in September 2021 and was again notified that she needed to provide additional documentation to qualify for medical assistance and SNAP. She was also notified that her SNAP benefits, which she was apparently still receiving, would increase from $929 to $992 monthly in October. She provided no further documentation related to her second application for benefits, but the record is undisputed that Child did not have health insurance until March 2022.

These documents do not support Mother's argument that she was prevented from obtaining adequate health coverage for Child due to government shutdowns, as she received prompt responses to both of her

applications and was able to submit necessary documentation by mail or online. She was able to complete the required interview by phone but there is no record of her doing so for either application. She finally made the first wellness appointment with Dorazio in March 2022 only after WCCB had become involved with the family and required her to have check-ups for all of the children. Dorazio testified that his office was not closed to the public between July 2021 and March 2022, that he was able to see patients who did not have insurance, and that the office employed individuals who would help patients with insurance inquiries. Finally, Dr. Eichman testified that Child would have been treated in any hospital emergency room even without insurance, and his condition was so severe as to merit emergency treatment. Based on this evidence, we cannot conclude that the disaster declarations related to the covid-10 pandemic constituted an environmental factor preventing Mother from obtaining medical care for Child. No relief is due.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/15/2023